GEORGE JACKSON AND OTHERS *vs.* JAMES HODGES AND OTHERS.

DEBTOR AND CREDITOR: COMPROMISE WITH CREDITORS PROCURED THROUGH FRAUD.—Where a debtor, having assets sufficient to pay all his debts, makes a false and fraudulent misstatement of his assets to his creditors, and thereby procures a settlement with them, by which they agree to accept his notes for fifty cents in the dollar on their claims, and surrender the original notes and execute a release of all their claims on his paying the compromise notes,—a Court of Equity on proof of the fraud, will set aside the settlement, and apply the property withheld from his creditors to the payment of the balance of their claims.

———: THE STATUTE OF LIMITATIONS'will not begin to run in such a case, until the fraud has been discovered or becomes known to the complainants.

APPEAL from the Circuit Court of Baltimore City.

The bill in this case was filed on the 28th of September, 1860, by the appellees against the appellants. After 1st, setting forth the original indebtedness of the defendant, George Jackson, to the complainants, the bill alleges :

2nd. "That the said George Jackson being so indebted to your orators, and also to various other persons and firms in large amounts, amounting in the whole, as your orators are informed and believe, and therefore charge, to the sum of fourteen or fifteen thousand dollars, and having a large amount of property, personal and leasehold, sufficient to enable him to pay his debts, and to have several thousand dollars of surplus, he conceived the idea of defrauding his creditors, and for that purpose increased his indebtedness much larger than it usually was, or the necessities of his business required, and having so increased it, represented himself as being compelled to suspend payment at a time, when he was able to pay his debts and have a considerable surplus, and when he was secretly lending his money to his brother, James Jackson, in large amounts, and having thus, and in other ways secreted a great portion of his

property and money, represented to his different creditors that he was unable to pay them in full, and that he was unable to pay more than forty *per cent.* of his liabilities, which your orators and his other creditors, as your orators are informed and believe, refused to accept; but after repeated representations as to his inability to do more for them than to pay forty *per cent.* on their claims unless by the aid of friends, he proposed to them to pay fifty *per cent.*, one-half in six months and one-half in twelve months without interest; your orators confiding in the representations, and believing that said George Jackson could not pay more than fifty *per cent.* of his debts, agreed, that is your orators and the said Lewis, Dorst & Co., and all his other creditors, agreed to accept in satisfaction of their claims, fifty *per cent.* thereon, payable without interest in two equal instalments, averaging twelve months after date thereof, upon which the said George Jackson delivered to your orators and said Lewis, Dorst & Co., and all his other creditors, his promissory notes as aforesaid, and they respectively received them in full satisfaction of their respective claims, and delivered to the said George Jackson all the notes of his in their possession to be canceled and executed to him a release of all debts, except the compromise notes so delivered to them by him as aforesaid.

3rd. That having fraudulently procured the release aforesaid, in the manner aforesaid, the said George Jackson soon after secretly and fraudulently deposited with said James Jackson, his brother, at different times, from the perpetration of said fraud until about a year afterwards, upwards of five thousand dollars; and about the same time the said George Jackson purchased several valuable lots of ground, namely: a lot on Lee street from Edward Chamberlain, worth about two thousand dollars; a lot on Howard street

which was leased by Henry Hursh and wife to said George Jackson and James Jackson, and which, with the money of the said George Jackson, they improved at an expense of about five thousand five hundred dollars; besides the property aforesaid, the said George Jackson owned at the time of the perpetration of the fraud aforesaid, a lot on Buren street worth about one thousand dollars, and a lot on Aisquith street worth about twelve hundred dollars.

4th. That sometime in the year eighteen hundred and fifty-seven, the said James Jackson conveyed to said George Jackson his interest in the said lot of ground on Howard street; that in the month of January, 1858, the said James Jackson became embarrassed, as your orators are informed and believe, and being indebted to said George Jackson in a large amount of money, namely: between five and six thousand dollars, sold to said George Jackson his entire stock of merchandise, worth about six or seven thousand dollars, in payment to the extent of said indebtedness from said James Jackson to George Jackson. The creditors of said James Jackson, knowing the insolvency of said George Jackson as aforesaid, and not doubting the reality thereof, and having no knowledge of said fraud, having received information of the said last mentioned conveyance and sale, concluded that said George Jackson, could not have it in his power to make said purchases, and were of opinion that the said sale and conveyance were made to defraud the creditors of said James Jackson, threatened the said George Jackson that they would file a bill in Chancery against him, and have said last mentioned conveyance and sale set aside, and the proceeds of the property so sold and conveyed by James Jackson to him, applied to the payments of the debts of said James Jackson, upon which, fearing an investigation thereof, and as your orators believe, and therefore charge

that the creditors of George Jackson would discover the fraud which had been perpetrated on them, in order to defeat their claims, and those of the creditors of James Jackson, by deed bearing date the 6th day of November, in the year 1858, and recorded among the Land Records of Baltimore City, in *Liber* " G. E. S.," No. 159, folio 188, &c., the said George Jackson assigned the said lot on Howard street to James Atchison for the pretended consideration of five thousand five hundred dollars, though as your orators are informed and believe, no consideration was given for said deed, but the same was made in secret trust for George Jackson, and by deed bearing date the 12th day of November, in the year 1858, and recorded among the Land Records of Baltimore City, in *Liber* " G. E. S.," No. 159, folio 415, &c., the said George Jackson, for the pretended consideration of twenty-five hundred dollars, assigned the said lot of ground on Lee street to George Russell, though no part of the consideration mentioned in said deed was paid, but the same was made to said Russell in secret trust for said George Jackson.

5th. That by deed bearing date the 28th day of December, in the year 1858, and recorded among the Land Records of Baltimore City, in *Liber* " G. E. S.," No. 162, folio 151, &c., made by said George Jackson to said George Russell, the said George Jackson assigned to said George Russell the said lot of ground on Aisquith street, and the said lot of ground on Buren street, as is pretended for the consideration of two thousand dollars, though no part thereof was paid, but the same was made in secret trust for said George Jackson.

6th. That by deed bearing date the 6th day of November, in the year 1858, and recorded among the Land Records of Baltimore City, in *Liber* " G. E. S.," No. 169, folio 506, &c., the said James Atchison, at the instance

and request of said George Jackson, assigned to Elizabeth Jackson, the wife of said George Jackson, the said lot of ground on Howard street, for the pretended consideration of five thousand five hundred dollars, though no part of said consideration was in fact paid.

7th. That by deed dated the 12th day of November, 1858, and recorded among the Land Records of Baltimore City, in *Liber* "G. E. S.," No. 170, folio 141, &c., the said George Russell, at the instance and request of said George Jackson, assigned to said Elizabeth Jackson, the said lot of ground on Lee street for the pretended consideration of two thousand five hundred dollars, though no part of said consideration was in fact paid.

8th. That by deed dated the 8th day of December, 1858, and recorded among the Land Records of Baltimore City, in *Liber* "G. E. S.," No. 172, folio 510, &c., the said George Russell, at the request and instance of said George Jackson, assigned to said Elizabeth Jackson the said lot of ground on Lee street, and the said lot of ground on Buren street, for the consideration, as is pretended in said deed, of two thousand dollars, though no part thereof was paid.

9th. That since the fraudulent compromise aforesaid, effected by said George Jackson with his creditors, the said Lewis, Dorst & Co., for a valuable consideration, assigned their said claim to said Hodges Brothers. That your orators had no knowledge that they had been so defrauded until within three months before the filing of this bill, and they are informed and believe, and therefore charge, that none of the creditors of said George Jackson had any knowledge until within the three months last past before the filing of said bill, that they had been defrauded by the said George Jackson.

10th. That the said James Jackson being indebted to

said George Jackson for a portion of said money, on or about the 16th of July, 1859, as your orators are informed and believe, passed to said George Jackson two promissory notes, made by a certain John Foley and endorsed by said James Jackson. That said George Jackson passed to a certain Silas M. Hamilton, said promissory notes, made by a certain John Foley and said James Jackson, and obtained a judgment against said John Foley and against said James Jackson, for the money mentioned in said promissory notes, namely : about four hundred and twenty dollars, and that the consideration for said promissory notes was part of the money secretly and fraudulently deposited by said George Jackson in the hands of said James Jackson as aforesaid, or a part of the proceeds thereof.

11th. That the said George Jackson, as your orators are informed and believe, paid said Silas M. Hamilton the said judgments, and has had the same entered to his use, and has caused to be issued thereon writs of "*fi. fa,*" directed to George H. Dutton, Sheriff of Baltimore City.

12th. Your orators further charge that by the making of said deeds to James Atchison and George Russell, he, the said George Jackson, rendered himself hopelessly insolvent, and unable to pay the debts he owes your orators and his other creditors, and also that the said Elizabeth Jackson had no money or property at the time of her intermarriage with said George Jackson, and that she has no money, property or effects, except that which was conveyed to her by the deeds aforesaid.

13th. That should said George Jackson obtain possession of said money mentioned in said judgments, and that owing to him by said James Jackson and said John Foley, he would, as your orators believe, fraudulently secrete it, and if in his power, place it beyond the reach of your orators and his other creditors.

14th. Your orators therefore charge, that the said property so conveyed to Elizabeth Jackson was obtained by her, through the instrumentality of said George Jackson, and without any money or other valuable consideration having been paid by her therefor, but that the same is held in secret, trust by her for said George Jackson, and that a portion thereof was owned by said George Jackson at the time he fraudulently persuaded his creditors to release him as aforesaid, and that the balance thereof was purchased with money, or the proceeds of the sale of property then owned by said George Jackson; and that the same or no part thereof, was acquired by him through any acquisitions he may have made subsequent to the perpetration of said fraud; and that the same was purchased from the proceeds of the sales of goods, sold by your orators and other creditors of said George Jackson, to said George Jackson, out of a part of which they have been as aforesaid, for the present, defrauded, and they now urge that in equity and justice, that said property and credits of said George Jackson, if not considered as theirs, should, so far as their said debts are concerned, be subject to the payment thereof, and also to the payment of all other creditors of said George Jackson fraudulently delayed as aforesaid.

15th. Your orators therefore charge, that the said promissory notes of George Jackson, delivered by your orators to George Jackson on the making of said compromise with him, were procured by him through fraud, and that the said deeds made by said George Jackson to James Atchison and to George Russell, and the deeds aforesaid, made by James Atchison and George Russell to said Elizabeth Jackson, were fraudulent and made with the view and intent to hinder, delay and defraud the creditors of said Geo. Jackson, of their lawful accounts and claims; and, also,

that the money deposited in the hands of James Jackson was so deposited with the view, purpose and intent to hinder, delay and defraud the creditors of said George Jackson of their lawful accounts and claims, of which money so deposited in the hands of James Jackson, or the proceeds thereof, there is in the hands of John Foley and James Jackson, about three thousand dollars.

The bill concludes with a prayer, that the said George Jackson, Elizabeth Jackson, his wife, James Jackson, John Foley, James Atchison, George Russell and George H. Dutton, may answer the matters and things hereinbefore stated and charged, as fully and particularly as if they were herein again repeated, and they were thereto especially interrogated ; and that said George Jackson may state what property, real, personal and mixed, and money and effects of which he was seized or possessed, immediately after the execution of said deeds to said James Atchison and George Russell, and of what the same consisted, and where located, and if out of his possession, in whose possession it was immediately after the execution of said deeds, and that he will state the value of each particular parcel of the property of which he was so seized or possessed at the time last aforesaid, and the value of the entirety thereof, and the amount of the money of which he was possessed, and the amount if any of the debts due to him, and by whom owing, and the amount owing by each of said debtors, and the residence of each of said debtors, and how, and in what manner such debts were contracted ; and that the said James Jackson and John Foley may be restrained from paying to said George Jackson the money mentioned in said judgments, or any money they owe him, and that they or either of them may be ordered to pay the same into Court, and all other money which they or either of them may owe him, the said George Jackson ; and that the said George H. Dutton, Sheriff of Baltimore City, may

be ordered and restrained from collecting the money mentioned in said writs of "*fi. fa.*," from said John Foley or James Jackson ; and the said George Jackson and Elizabeth Jackson, his wife, may be restrained from collecting the rents, selling, disposing of or conveying any of the property conveyed to said Elizabeth Jackson, by the deeds aforesaid, made to her by said George Russell and James Atchison, and from collecting the rent thereof, and that an account may be taken of the rents of said property since the date of said deeds, and that Elizabeth may be decreed to pay the same to your orators and the other creditors of George Jackson, as this Hon. Court may direct from said John Foley or James Jackson ; and that a decree may be passed setting aside as fraudulent and void the said deeds made by said George Jackson to said James Atchison, and the said deeds made by said George Jackson to said George Russell, and the said deeds made by said George Russell to said Elizabeth Jackson, and the said deed made by said James Atchison to said Elizabeth Jackson ; and that the property mentioned in or described in said deeds from George Russell to said Elizabeth Jackson, and that described in the said deed from said James Atchison to said Elizabeth Jackson, be sold, and in the meantime that a receiver may be appointed to collect the rents of said property, and the said debts owing by James Jackson and Foley, and the proceeds thereof, together with the money mentioned in said judgments, and that which may be owing by James Jackson and John Foley, to said George Jackson, be applied, so far as may be necessary, to the payment of said claims of your orators, and to the claims of all the other creditors of George Jackson, defrauded by him as aforesaid ; and that said releases may be declared void, and that your orators may have such other and further relief as their case may require.

The defendants, George Jackson and Elizabeth Jackson, filed an answer to the bill, and a decree *pro confesso* was

taken against the other defendants. Under the commission for testimony a number of witnesses were examined and a mass of documentary evidence was filed.''

*James Atchison,* examined by the complainants, and being shown complainants' Exhibit A, filed under the commission, stated as follows :

The property therein described was conveyed to me by George Jackson ; I gave Jackson my notes for the consideration money therein mentioned, viz: $5,500 ; I gave him eleven notes of $500 each ; I paid no money on account of the said notes ; I renewed said notes some five or six months ago ; Jackson has never demanded payment of the notes from me ; I do not know who prepared the deed ; I did not pay for preparing the deed—I presume Jackson did ; Jackson paid for acknowledging the deed—he also paid for the recording of the deed ; I never got possession of said property,—never got any part of it,—never paid any ground rent on it or taxes ; I am not related to Jackson.

'' Complainants' Exhibit B,'' filed under the commission-in-chief in this cause, was here shown to witness, who further testified as follows :

On the same day that Jackson conveyed the property above referred to, to me, I conveyed it to Elizabeth Jackson, his wife, without any consideration ; Mrs. Jackson is not related to me ; I was acquainted with Mrs. Jackson from one to two years previous to making the conveyance to her ; she was not present when I executed the conveyance to her ; she did not give or promise me anything for the conveyance ; nor did her husband give or promise me anything for making the said conveyance, and I did not ask him for anything.

*George Russell,* a witness for complainants, testified as follows :

I know the house of Hodges & Brother, and I know all the parties defendants; George Jackson made a deed of some property to me in 1858,—I think there were two houses conveyed to me—one of them in Lee street and the other somewhere in Old Town; I paid very little attention to them; I did not, to my knowledge, see the house in Old Town before it was conveyed to me; I cannot say that I saw the house in Lee street before it was conveyed to me, but I may have seen it afterwards, as Jackson is now living in a house on Lee street where I have been, and presume it to be the house that was conveyed to me; Jackson came to me and proposed selling the houses as he had got into some difficulty with his brother; I did not want to buy the houses; I did, however, take an assignment of them.

"Complainants' Exhibits C and D," filed under the commission-in-chief in this cause, was here shown to witness, who proceeded:

I gave Jackson my notes for the consideration mentioned in said Exhibit C; I gave him five notes for $500 each, payable at 4, 8, 12, 16 and 20 months; I did not pay said notes; I did not pay a cent on account of them; I renewed said notes about six months ago; I don't know who prepared the deed; I don't know who paid for drawing the deed; nor do I know who paid for the recording of the deed; I did not pay for any; I never got possession of the property, or received any rents from it, or pay any ground rent or taxes; on the same day I conveyed said property to the wife of George Jackson, for which I received no consideration, and I was not promised any consideration; I think Mrs. Jackson was not present at the making of the conveyance to her; I had known Mrs. Jackson from one to two years; neither Mr. or Mrs. Jackson are related to me.

" Complainants' Exhibits E and F," filed under the commission-in-chief in this cause, were here shown to witness, who continued as follows :

The first conveyance from Jackson to me was for one lot, and in a subsequent conveyance there were two lots conveyed to me by him ; I don't know where the two lots named in the subsequent conveyance are situated ; I never went to examine them before I took the conveyance for them ; I gave him four notes for the consideration money for $500,—each payable in 4, 8, 12 and 16 months ; I did not pay said notes, or anything on account of them ; they were renewed at the same time with the others ; I don't know who prepared the deed,—I did not pay the cost of preparing it, or acknowledging or recording it ; I never got possession of this property, and never asked for it ; I can't tell where the lots are located ; I think one is in Buren street ; I don't know where the other is ; I conveyed said property on the same day to George Jackson's wife without consideration ; I received none, asked for none, and none was promised me ; I understood from my conversation with George Jackson that I would be called upon to pay the notes I gave him, and that he was making the property over to his wife to avoid the payment of his brother's debts, and this was the mode he adopted to accomplish it.

*James Jackson,* a witness for the complainants, then testified as follows : I know all the parties to this suit with the exception of Sheriff Dutton, and I am not able to say whether I know him or not. My business in 1855 was coach-making, and I was engaged in that business seven or eight years previous to 1855. My brother, in the year 1855, was engaged in peddling with a horse and wagon, and had been so engaged for five or six years ; he failed in business in the year 1855 ; before he failed I had a conver-

sation with him in reference to his postponing the payment of his debts. In talking over matters he told me he had made up his mind to fail. In the course of his conversation he said he was going to put off the payment of his notes by renewals, or getting extensions for the purpose of getting in debt as deep as he could; he said he was going to fail, and that he intended not to fail empty-handed—those were about the words he used. This conversation was some four or five months before he failed; he failed in the summer of 1855. I had been in the habit of borrowing money from him before he failed; he was in the habit of loaning money to me about the time he told me he was going to get his paper renewed. When he failed I was indebted to him in about $500 or $1,000; he did not call in the loans he made me at the time he failed; he continued to loan me immediately after he failed; from the time of his failure up to the year 1858, my indebtedness to him increased up to $5,000. "Complainants' Exhibit F F," filed under the commission-in-chief on 17th December, 1860, being shown to witness, he further proved as follows: The property therein described is the property that he and his brother, George Jackson, leased from Henry Hursh and wife. Almost immediately after we leased said property we began to improve it, and had the improvements completed in about six months thereafter at a cost of about $5,500; George advanced the greater part of the money for the improvements. "Complainants' Exhibit G," filed under the commission-in-chief on 17th December, 1860, now shown to witness, is the assignment of said property from witness to his brother George. At the time of the said assignment we adjusted our accounts, and I was found indebted to George, after having made the assignment, in the sum of $2,378 or $2,379 and some cents. George went into my employ about the 1st January, 1857, at a salary

of $500 ; he was my general superintendent ; he remained in my employ from January, 1857, until the fall of 1858, during which time he was absent about three months. I know a lot of ground on Lee street which my brother George told me he paid $2,000 for. I have seen the house on Aisquith street ; he leased the said lot from Jas. Mullin, and George himself improved it ; he told me it cost $1,400 to improve it. I have seen the property he owned on Buren street ; he said it cost him from $1,000 to $1,100. Some time after George's failure, he stated in a conversation that he had with me, that if he was successful in winding up his business he expected to be worth from $16,000 to $18,000. I remember that in a conversation with George, soon after his failure, George told me that he could have paid all his debts and have something left. I remember when George was compromising with his creditors—I endorsed his compromise notes. I do not know the amount I endorsed ; I did not, about that time, refuse to endorse any notes that he wanted me to endorse. I never refused to endorse any of the compromise notes on the ground that I wanted the old notes held by the creditors first to be returned ; I endorsed all the compromise notes when and as he wanted me to endorse them. About the time of the compromise George never asked me to advance any money for the payment of any of his creditors ; I had no communication with any of George's creditors in reference to the compromise ; I did not tell George that I would pay his creditors fifty cents on the dollar, deducting one per cent. a month for twelve months. From the time I had the settlement with George in February, 1857, when we adjusted our accounts, he increased my indebtedness to him by loans and merchandise, so that in the summer of 1858 I was indebted to him in the sum of $5,000.

31    v. 24.

The cause having been heard, the Court (KREBS, J.) on the 28th of November, 1861, passed a decree by which the deed dated the 6th of November, 1858, from Geo. Jackson to James Atchison; the deed dated the 6th of November, 1858, made by James Atchison to Elizabeth Jackson; the deed dated the 12th day of November, in the year 1858, made by George Jackson to George Russell; the deed dated the 12th day of November, in the year 1858, made by Geo. Russell to Elizabeth Jackson; the deed dated the 28th day of December, 1858, made by George Jackson to George Russell, and the deed dated the 28th day of December, in the year 1858, made by George Russell to Elizabeth Jackson, were vacated, annulled, and declared to be utterly void and of no effect as against the complainants, and all others the creditors of said George Jackson, for debts contracted before the 28th day of December, in the year 1858.

And it was further adjudged, ordered and decreed, that so much of the property intended to be conveyed by said six deeds, as may be necessary to satisfy the complainants and all others, the creditors of said George Jackson, for debts contracted before the 28th day of December, 1858, with the interest that may have accrued thereon, and the costs of this cause, be sold, unless the said George Jackson or Elizabeth Jackson shall, on or before the 1st day of May, 1862, pay and satisfy, or bring into this Court to be paid to said creditors the amount of their claims and of the costs in this cause; provided, however, that no part of said property be sold until such sale can be made consistently with the provisions of the Act of Assembly of 1861, ch. 17, and any other Act staying such sales; that John McLaughlin be and he is hereby appointed trustee to make said sale; that the course and manner of his proceedings shall be as follows, &c., &c.

And the decree then proceeds as follows:

It is further adjudged, ordered and decreed, that the proceedings in this cause be referred to the auditor to state an account between George Jackson and James Jackson and John Foley, and to ascertain the amount due from said James Jackson and John Foley and each of them, to George Jackson, arising from money loaned by said George Jackson to said James Jackson, before the 28th of December, 1858, and for rent accrued for, or on account of, any ground conveyed by said deeds.

It is further adjudged, ordered and decreed, that the said James Jackson and John Foley pay to said John McLaughlin, trustee, the money that may be so found due by them and each of them, to said George Jackson.

It is further adjudged, ordered and decreed, that the auditor state an account of the rents collected by said Elizabeth Jackson for or on account of the property mentioned in said deeds since the execution thereof, deducting therefrom ground-rent, taxes and expenses of keeping said property in order.

It is further adjudged, ordered and decreed, the said trustee shall bring into this Court the money arising from said sales, and collections by him to be made by virtue of this decree, to be distributed by the Court after deducting all costs and expenses necessarily incurred in the collection thereof, and such commission to the said trustee as the Court shall think proper to allow in consideration of the skill, attention and fidelity, wherewith he shall have discharged his trust.

And it is further adjudged and decreed, that the defendant, George Jackson, pay the costs of this suit, to be taxed by the clerk ; reserving however for further consideration and decree or order, all equities and priorities, as to the distribution of the money so to be brought into Court, and also the disposition of the certificate of Baltimore City six per cent. stock, in reference to all of which the parties

hereto are permitted to take testimony before the auditor, and also in reference to the accounts to be stated as aforesaid.

From this decree the present appeal is taken.

The cause was argued before Bowie, C. J., and Bartol, Goldsborough, and Weisel, J.

*Bernard Carter* for the appellants.

The bill of complainant is a long one; but an examination of it will show that, in order to sustain it, the appellees must prove that the settlement made by George Jackson with his creditors in 1855, was procured by fraud on his part. This allegation is the sole foundation of the bill. All other allegations in the bill, and all the evidence in the case, need only be considered as they bear upon this one single inquiry. If the appellees fail to make out affirmatively the above proposition, their bill will have to be dismissed. The bill itself alleges that the complainants released their indebtedness in 1855; if, therefore, there was no fraud on the part of George Jackson, that indebtedness is entirely extinguished; and no matter how prosperous Jackson became afterwards, the bill must be dismissed.

The bill charges that this release and settlement was procured by fraud. Then the appellees must prove it. 12 *Cush.*, 30. *Duvall vs. Coale*, 1 *Md. Ch. Dec.*, 168. *Paige vs. Bent*, 2 *Medcalf*, 371.

In what is the fraud alleged to have consisted? In this: That George Jackson, just prior to his declaration to his creditors, that he could only pay a part of his indebtedness, had purposely increased that indebtedness, and then declared he had not assets sufficient to pay it with, though he

had in fact enough, and more than enough, and knew he had enough and more than enough. And 2d. That he so concealed and hid away his assets from his creditors, that they could not ascertain their real condition.

Two things must therefore be shown : 1st. Sufficient assets, and knowledge on the part of Jackson of such sufficiency. 2nd. Concealment of the means of such knowledge from the creditors, and false and fraudulent representation of the condition of said assets.

The appellees say, that Jackson is shown to have had money and to have bought property soon after the settlement ; and that therefore he must have had assets sufficient to pay his debts when he made the settlement. There is no doubt that he did purchase property subsequent to his settlement, and loaned money to his brother James. But in order that this acquisition of property should benefit the case of the complainants, it must be shown : That this possession of said property after the settlement of August, 1855, was absolutely inconsistent with any representations which he is proved to have made to his creditors.

We respectfully submit that in the absence of all direct proof to show that Jackson had more stock in his store, or more debts due him, or more money in hand than was embraced in his written or oral statements made to his creditors, no Court will infer a fraudulent and false representation of his assets, from the possession by him of the amount of property shown to have been in his possession subsequent to the settlement. *Sto. Eq. Jur.*, §§ 191–197–199. *Sto. Eq. Pl.*, § 271. *Code, Art.* 16, *sec.* 35. *Brown vs. Brinkershoeck*, 6 *Johns.*, 139. *McDowell vs. Goldsmith*, 2 *Md. Ch. Dec.*, 341, *and* 6 *Md. Rep.*, 337. *Murray vs. Costar*, 4 *Cowen*, 627. *Yeaton vs. Lenox*, 8 *Peters' Rep.*, 127.

*P. McLaughlin* for the appellees.

The plea of limitations cannot avail the defendants in this cause, because they do not reply to the allegations of fraud secretly perpetrated, and no discovery thereof, though the bill alleges that the frauds were perpetrated secretly, and that the creditors had no knowledge thereof until within three months of the filing of the bill. *Secs.* 2, 3, 4, 9 *of the bill.* 2 *Story's Eq. Jur.*, § 1521, 1521 *a*. *Story's Eq. Pl.*, 754. *South Sea Co. vs. Wymndsel*, 3 *P. Wm.*, 143. As to the frauds, see 7 *Cowen*, 301, 305. *Rollins vs. Moore*, 23 *How.*, 474, 479.

On the question of multifariousness, see 1 Code, Art. 5, secs. 26 and 27 ; also Art. 16, sec. 16, title "Chancery," sub-title "Amendment." The objection of multifariousness ought to have been taken below, for under the Article and section last referred to we could have amended. There is no multifariousness in this case as to parties. *Story's Eq. Pl.*, § 286. The usual practice of raising the objection as to parties is by *demurrer*, but when raised at the hearing it is not always fatal, and will be allowed at the discretion of the Court. But where the Court can see that the reason of the rule upon which such objections are founded, does not apply, and the objection is not made by demurrer, the Court will not interfere *sua sponte*. *Hamilton vs. Whitridge*, 11 *Md. Rep.*, 129. *Story's Eq. Pl.*, § 271, *note a*, and cases there cited. *Parr vs. The Att'y Gen.*, 8 *Clarke & Fin.*, 434.

BARTOL, J., delivered the opinion of this Court.

In the year 1855, the appellant, George Jackson, being indebted to the appellees and others, in large sums, represented to his creditors that he was unable to pay more than fifty cents in the dollar of his debts, and proposed to them to accept that proposition in full satisfaction of their

claims ; they confiding in his honesty, and relying upon his representations with regard to the value of his assets, accepted his proposition and received from him promissory notes endorsed by his brother, James Jackson, payable on an average of twelve months, without interest, to the amount of fifty per centum of the sums respectively due them, and released and surrendered their claims.

Afterwards, a short time before the filing of the bill of complaint in this case, the appellees being informed that George Jackson, the appellant, had not truly represented his pecuniary condition, but had concealed and secreted a large amount of property for his own benefit, instituted this suit for the purpose of annulling and setting aside the settlement made in 1855, and subjecting the property of George Jackson to the payment of the balance of their claims.

The main allegation of the bill, upon which the appellees' claim for relief depends, is that the settlement of 1855 was procured by fraud on the part of George Jackson. The fraud is alleged to consist in his falsely representing himself as unable to pay more than fifty per centum of his debts, when in fact he had property enough to pay them in full ; and in his concealing from his creditors the real amount and value of his property, and thereby inducing them to accept the composition proposed.

As fraud is never presumed, but must be established by proof, it is our duty to examine the evidence contained in the record, and to determine whether in our opinion, it is sufficient to prove the fraud and deception charged in the bill of complaint.

It appears from the evidence, that in order to induce his creditors to accept the terms offered, George Jackson exhibited to them a statement of the amount of his debts, and the estimated amount or value of his property, consist-

ing of his stock of goods on hand, and the debts due him considered as good. These statements are not produced, nor is there any very distinct evidence of the several amounts or estimates contained in the statement.

It plainly appears from the testimony of *Allen T. Lewis*, one of the creditors, who was examined as a witness both for the complainants and the defendants, that the statement exhibited by George Jackson did not contain an invoice of his stock of goods, or specify in detail either the items of his property or a list of the sperate debts due him, but merely the aggregate amount of his liabilities, and two items showing the aggregate amount of his property and sperate debts.

There is no dispute about the amount of his liabilities ; by an agreement signed by the solicitors, they are admitted to have been in the aggregate $18,546 16.

The witness, *Allen T. Lewis*, states that he made the calculation from the statement shown, and the result was that after paying fifty per cent. there would be left to George Jackson a surplus or margin of $1,800 or $2,000, which he thought was " no more than he was entitled to have for selling the goods, making the collections, and for the risk he would run, and including also a little margin to enable him to go on and continue business." He also states that George Jackson represented that the statement " embraced all his property except his household furniture, which he (witness) thought the creditors ought not to require of him."

This evidence is conclusive to show that the whole amount of his property as represented to his creditors, was from $11,000 to $11,273. This is ascertained by adding $1,800 to $2,000 to the sum of $9,273, the sum proposed to be paid to the creditors.

What was the whole value or amount of his assets at

that time is not proved by direct evidence. But he concedes in his answer that the estimate he then put upon his stock of goods was $13,000, (and that they were actually sold for more.) James Jackson, his brother, owed him $500 to $1,000. What other debts were due him is not shown. He owned two improved lots, one on Buren street, and one on Aisquith street, both of which, however, were encumbered with mortgages, and their value, if any, beyond the amount of the incumbrances, does not clearly appear. But estimating only the stock of goods on hand, and the debt then due him from James Jackson, it is clear that these items together exceed by the sum of $2,500 or $3,000, the whole amount represented by him on his statement, shown to the creditors to be the whole value of his property. In addition to this, the proof shows that within six months after he effected the composition with his creditors, he purchased a lot on Lee street for $2,000, and in little more than a year had advanced in cash for the improvement of the property on Howard street (leased by him and his brother James,) the additional sum of $5,500. And as no other explanation is afforded by the evidence, we are compelled to the conclusion that his property and effects at the time of the settlement greatly exceeded the amount represented by him to his creditors, and were sufficient to pay his debts in full. This is the irresistible conclusion from the evidence in the cause, independently of the positive testimony of James Jackson, of which we shall speak presently.

There are some other facts conclusively established by the proof, that are inconsistent with honesty, truth and fair dealing on the part of George Jackson, in procuring the settlement with his creditors.

He represented that his disasters in business had been occasioned by the protracted illness of his wife, and the consequent large expenses incurred by him. The proof

HARVARD LAW SCHOOL LIBRARY

shows that her illness was of short duration ; and though
he had the misfortune to lose her in the spring of 1855, the
evidence of Dr. Flemming, the family physician, shows
that his medical bill did not exceed twenty dollars, and
there is no evidence of any large losses or expenses incurred
by him.

His correspondence with his creditors in New York and
Philadelphia, Messrs. Johns & Payne, Sharpless Brothers,
Amer & Co., and Hammil, Wevil & Co., exhibited in the
record, both in its tone and substance, shows a reckless dis-
regard of truth and fair dealing on his part.

While, dictating to them his own terms in a most arbi-
trary way, he represents to them that his brother James,
whom he offers as endorser on his notes, insists upon hav-
ing the old notes surrendered before he is willing to become
his surety, when in fact, according to James' testimony, he
was not even consulted on the subject. He represents that
his brother James is willing to discount the new notes at
the rate of one per cent. a month, and in some cases the
new notes were actually shaved at that rate, not by his
brother James, but by himself; showing that he had at
that time ready money on hand.

From these facts, combined with the evidence that within
a brief period after his composition with his creditors, he
was in possession of property of large value, amounting,
according to his own statement made to Hayward, the
Justice of the Peace, in 1859, to $15,000 or $20,000, as
proved by the witness McCauley, in the absence of any sat-
isfactory explanation of the way in which this property was
acquired, are convincing proofs that the statement made to
his creditors by George Jackson, upon which they relied,
and by which they were induced to enter into the composi-
tion with him, was grossly untrue and fraudulent.

If there were any doubts, however, on this subject, they
would be removed by the positive evidence of James Jack-

Jackson et al. *vs.* Hodges et al.

son, who testifies to the fraudulent purposes of George Jackson, and the deception practiced by him upon his creditors in procuring the settlement of 1855.

If the case of the complainants rested exclusively upon the testimony of this witness, unsupported by other proof, we should hesitate in affirming the decree of the Circuit Court. But that testimony is corroborated by other proof, and in those particulars in which it is not positively supported it seems to us to be consistent with the other evidence, and is therefore not to be absolutely rejected.

The result of a most careful examination of the whole case, has convinced us that the fraud charged in the bill has been established by the proof, and therefore that there is no error in the conclusion reached by the Circuit Court upon the facts of the case.

We are of opinion that the exceptions to the bill, on the ground of multifariousness, are not well taken, even if they had been made in time. ·

We are also of opinion that the defence, under the statute of limitations, is not supported. In such case, according to all the authorities, the statute does not begin to run until the fraud has been discovered, or becomes known to the complainants, which the proof in this case shows was not until a few months before the filing of the bill. A decree will be signed affirming the decree of the Circuit Court, with costs, and remanding the cause for further proceedings.

*Decree affirmed and cause remanded.*

(Decided April 18th, 1866.)